FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   NOV 2 6 2019   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE APPLICATION OF ANDREW RIPPERT
TO OBTAIN DISCOVERY FOR USE IN A
PROCEEDING IN A FOREIGN TRIBUNAL
PURSUANT TO 28 U.S.C. § 1782(a)

)
)
)
)
)
)

MISC 19 - 3029

Civil No. 19 Misc.____

DeARCY HALL, J.

### DECLARATION OF PETITIONER ANDREW RIPPERT
### IN SUPPORT OF APPLICATION TO OBTAIN DISCOVERY FOR USE
### IN A PROCEEDING IN A FOREIGN TRIBUNAL PURSUANT TO 28 U.S.C. § 1782(a)

I, Andrew Rippert, declare as follows:

1. I am the Applicant in the above-captioned matter.

2. I have personal knowledge of the matters set forth in this Declaration, except as to those matters that I indicate below are based on my belief or understanding, and as to those matters, I believe them to be true.

3. I submit this Declaration in support of my Application to Obtain Discovery for Use in a Proceeding in Foreign Tribunal Pursuant to 28 U.S.C. § 1782(a).

4. I commenced employment with Arch in 2010. From September 2010 until January 2014, I was Executive Vice President of Arch Reinsurance Ltd. In January 2014, Arch appointed me Chief Executive Officer ("CEO") of Arch's Global Mortgage Group. Arch did not request that I sign an employment agreement in connection with my promotion to CEO of the Global Mortgage Group.

5. During my tenure as CEO of the Global Mortgage Group at Arch, I was in charge of a network of operations that provided mortgage insurance and reinsurance around the world. As CEO of the Global Mortgage Group, I was responsible for leading and managing global mortgage credit risk operations for Arch, including mortgage insurance, reinsurance and credit

risk transfer transactions in, among other areas, the United States, Europe, Australia, and Asia.

6.      I oversaw Arch's transformation from a new entrant in the U.S. mortgage insurance market in 2014 to the industry leader, primarily through the 2017 acquisition of mortgage insurer United Guaranty Corporation from American International Group, Inc. I was also instrumental in the development of reinsurance execution for GSE credit risk transfer transactions under Freddie Mac's Agency Credit Insurance Structure transactions and the development of innovative programs at Freddie Mac and Fannie Mae.

7.      My success as CEO of the Global Mortgage Group was substantial and well-documented.  Underwriting income at Arch increased from $20,579,000 in 2013, the year before I was appointed CEO of the Global Mortgage Group, to $856,593,000 in 2018.    In addition, I gained recognition as a leader in the mortgage industry, was appointed to the boards of the Mortgage Bankers Association and the Housing Policy Council, and testified before the United States Congress on issues relating to the housing finance industry.

8.      Almost four years after my promotion to CEO of the Global Mortgage Group, Arch required that I sign an employment agreement for the position.

9.      In or about October 2017, Arch presented me with a written employment agreement governing the position as CEO of the Global Mortgage Group, to which Arch first appointed me in January 2014. I did not have a prior employment agreement with Arch relating to the position.  On about October 30, 2017, Arch and I executed the written employment agreement (the "Employment Agreement").  A copy of the Employment Agreement is attached as Exhibit 1.

10.      The Employment Agreement sets forth, among other terms, my duties as CEO of Arch's Global Mortgage Group. The Employment Agreement contains noncompetition (§ 9.01)

2

and nonsolicitation (§ 9.02) covenants, and a garden leave provision (§ 9.05). The Employment Agreement also contains an arbitration clause (§12.16).   Arch did not provide me with consideration for any of these provisions.

11.     The arbitration clause provides inter alia:

> Save for where the Company chooses to exercise its rights as described in Section 10.01, in the event that a dispute or difference shall arise between the parties out of, in connection with, or concerning this Agreement, such dispute shall be referred to and determined by a sole arbitrator in a confidential private arbitration in accordance with the UNCITRAL rules as same are incorporated into the Bermuda International Conciliation and Arbitration Act 1986, except as they may be modified herein or by mutual agreement of the parties. . . . The seat of arbitration shall be Bermuda and it shall be conducted in the English language.

Employment Agreement, ¶ 12.16.

12.     I believe Marc Grandisson, then the President and Chief Operating Officer of Arch, required that I execute the Employment Agreement because he planned to terminate my employment at Arch and to harm my career after my employment at Arch ended.  I believe that no other officers in the Global Mortgage Group were required to sign written employment agreements.

13.     Notwithstanding my demonstrably successful tenure as CEO of Arch's Global Mortgage Group and my stellar reputation in the housing finance industry, as well as the support of Arch directors, in February 2019, Mr. Grandisson removed me as CEO of the Global Mortgage Group. I believe Mr. Grandisson made the decision to remove me as CEO of the Global Mortgage Group because he viewed me as a successful rival who was beginning to eclipse his accomplishments, particularly as I was gaining increased notoriety in the mortgage industry though my appearances before Congress and my involvement in leading industry groups such as the Mortgage Banking Association.

14.     On February 6, 2019, I met with Mr. Grandisson and Carl Sullo, Chief Human

3

Resources Officer at Arch, who notified me that Arch was removing me from the position of CEO of the Global Mortgage Group. Asserting without basis that I was "difficult to work with," Mr. Grandisson stated, "We need to find something else for you to do." I denied the assertion and informed Mr. Grandisson that the decision to remove me as CEO of the Arch Global Mortgage Group was yet another of Mr. Grandisson's multiple attempts in recent years to undermine my credibility and to attack me personally and professionally.

15.     For at least two weeks, Arch did not inform me what my new position would be or what the duties of the new position would be. On February 26, 2019, Arch presented me with a draft communication from Mr. Grandisson to Arch employees concerning my new position at Arch. The draft communication stated in part:

> I'm pleased to announce that Andrew Rippert has been named Arch's first Chief Innovation and Strategic Investment Officer, reporting to me.
>
> In this role, Andrew will focus his attention on some of the critical issues facing the Mortgage Group in the housing finance industry, work to ensure a standardized approach to government relations across our operating units and engage with leaders across all of our business lines to pursue new ideas and opportunities. The goal is for us to prepare for the next several decades and insure that we are approaching our business as the disruptors, instead of the disrupted.

16.     On March 1, 2019, Arch publicly announced my removal as CEO of the Global Mortgage Group and my appointment as Chief Innovation and Strategic Investment Officer. Also on March 1, 2019, I emailed a "term sheet" to Mr. Grandisson and Mr. Sullo setting forth proposed terms of an agreement to govern my position as Chief Innovation and Strategic Investment Officer. Mr. Grandisson did not respond to my proposed term sheet.

17.     I had serious concerns that Mr. Grandisson had no intention of assigning any significant duties to me in this new position, but instead intended to isolate me and effectively deprive me of the opportunity to make use of my expertise, experience and reputation in the

housing finance industry, and to damage my career in that industry. Those concerns proved to be well founded.

18.     On Sunday, March 17, 2019, I met with Mr. Grandisson in Bermuda. The purpose of the meeting was to discuss my proposed terms of an agreement to govern my new position at Arch. Mr. Grandisson told me that in my new position at Arch, I will not run any businesses that I innovate or develop for Arch. Rather, the new businesses will be taken from me and given to someone else. Mr. Grandisson told me that I should not care what becomes of the business innovations I develop because Arch is going to pay me and that is all that matters. Mr. Grandisson stated at the meeting that he will not provide me with any staff to fulfill my responsibilities in my new position at Arch. I informed Mr. Grandisson that the past twenty-five (25) years of my career had been entirely within the housing finance industry and I could not simply walk away from that career. Mr. Grandisson responded: "Well, that is what you will do if you are to remain employed by Arch." Even though the stated purpose of the March 17 meeting was to discuss my term sheet setting forth proposed terms for an employment agreement governing my position as Chief Innovation and Strategic Investment Officer, Mr. Grandisson did not even respond to my term sheet. In fact, Mr. Grandisson specifically stated that he would not provide me any feedback on my term sheet until I assured him he was willing to stay at Arch. Mr. Grandisson told me to take two weeks and think about what I want to do, and if I agreed to stay at Arch, Mr. Grandisson would respond to the term sheet. Alternatively, Mr. Grandisson stated, I could work for the next six months and figure out what I wanted to do.

19.     On April 15, 2019, through my attorneys, I gave Arch written notice that Arch's removal of me as CEO of the Global Mortgage Group and my subsequent appointment as Chief Innovation and Strategic Investment Officer constituted "Good Reason" for termination of

5

employment at Arch as the term is defined in the Employment Agreement.[1]   The April 15, 2019

letter also set forth my business plans following the termination of my employment at Arch:

> Mr. Rippert does not intend to compete with Arch.   Mr. Rippert intends to establish what can best be described as a residential mortgage REIT.   The company's business activities will include the buying, selling and managing of mortgage loans, mortgage backed securities and related mortgage instruments, including mortgage servicing rights for the expanded credit market.  The company will seek funding by raising equity capital, 'warehouse lines of credit,' issuance of mortgage backed securities, establishing specific targeted investor funds for the purpose of owning mortgage loan portfolios.  Arch has no comparable business and Mr. Rippert's proposed business would not threaten the misappropriation of Arch's confidential information or goodwill.   Accordingly, Mr. Rippert's proposed business will not constitute a 'Restricted Business' as that term is defined in the Employment Agreement or 'Competitive Activity' as that term is defined in Mr. Rippert's various incentive award agreements with Arch.

20.     One week later, Arch directed that I begin a Garden Leave for six (6) months and

that I "perform no duties" during that period.  During the Garden Leave, I complied with my

obligations to Arch in all respects.   While I made preparations during the Garden Leave to

launch the residential mortgage REIT described in the April 15, 2019 letter after my employment

with Arch terminated, I did not operate or conduct the planned business during the Garden

Leave.

21.     Nonetheless, on July 19, 2019, Arch terminated my employment, purportedly "for

Cause," as that term is defined in the Employment Agreement, asserting that I breached the

noncompetition and nonsolicitation provisions of the Employment Agreement.[2]   In fact, Arch

---

[1] The Employment Agreement defines "Good Reason" as follows: "'Good Reason' means, without the Executive's written consent and subject to the timely notice requirement and the Company's opportunity to cure set forth in Section 5.05 below, (a) the material diminution of any material duties or responsibilities of the Executive; (b) a material reduction in the Executive's Base Salary; or (c) any material breach by the Company of the provisions contained in this Agreement." Employment Agreement, § 1.01.

[2] The Employment Agreement defines "Cause" as follows: "'Cause' means (a) theft or embezzlement by the Executive with respect to the Company or its Affiliates; (b) malfeasance or gross negligence in the performance of the Executive's duties; (c) the Executive's conviction of any felony or any crime involving moral turpitude; (d) willful or prolonged absence from work by the Executive (other than by reason of disability due to physical or mental illness) or failure, neglect or refusal by the Executive to perform his duties and responsibilities without the

had no Cause to terminate my employment. I did not breach the noncompetition provision of the Employment Agreement. While I made plans to operate a business after termination of my Arch employment, I did not operate any business during the Garden Leave and the business I made plans to operate did not compete with any business operated by Arch. Moreover, while employed by Arch, I did not solicit directly or indirectly, induce or attempt to induce any current or former officer, director, underwriter or manager of Arch with whom I had material dealings at any time during the twelve months prior to the date Arch terminated my employment to leave Arch or in any way interfere with Arch's employment of that officer, director, underwriter or manager. While employed by Arch, I did not induce or attempt to induce any firm, company or person who was a customer, investor, supplier, insured, reinsured, reinsurer, broker, agent, licensee or other business relation of Arch, and with whom I had material dealings during the twelve months before Arch terminated my employment, to cease doing business with Arch. While employed by Arch, I did not use or disclose any Arch confidential information or trade secrets, except where such use or disclosure was directly related to and was required by my performance of the duties assigned to me pursuant to the Employment Agreement. Thus, by terminating my employment for Cause when it was aware that there was no Cause, Arch breached the duty of trust and confidence it owed to me and terms of the Employment Agreement.

22. On the same day that it terminated my employment, namely July 19, 2019, Arch also initiated the Bermuda Arbitration by serving its "Statement of Claim." I understand that on August 21, 2019, my attorneys served my "Statement of Defence/Answer and Counterclaims." I

---

same being corrected within ten (10) days after being given written notice thereof; (e) continued and habitual use of alcohol by the Executive to an extent which materially impairs the Executive's performance of his duties; (f) the Executive's use of illegal drugs; or (h) the material breach by the Executive of any of the covenants contained in this Agreement." Employment Agreement, § 1.01.

understand Arch served an "Answer and Defenses" to my Counterclaims on September 19, 2019.

23.     The issues in dispute in the Bermuda Arbitration relate to Arch's wrongful termination of my employment.

24.     In September and October 2019, through our respective attorneys, Arch and I explored the possibility of mediation. However, we never mediated our disputes and now have restarted the Bermuda Arbitration.

25.     I believe Constantine Iordanou resides in the Eastern District of New York.  Mr. Iordanou served as Chairman of the Arch Board of Directors from January 2002 until September 2019.  Mr. Iordanou was Chairman of the Arch Board of Directors when Arch removed me from the position of CEO of the Global Mortgage Group and when Arch terminated my employment. In addition, Mr. Iordanou was Chairman of the Arch Board of Directors when Arch initiated the Bermuda Arbitration and my attorneys served my Statement of Defence/Answer and Counterclaims in the Bermuda Arbitration.   I believe Mr. Iordanou attended Arch board meetings at which the subject of my removal as CEO of the Global Mortgage Group and termination from Arch, as well as the Bermuda Arbitration, were discussed.

26.     Between March 29, 2019 and May 19, 2019, in the months before Mr. Iordanou's term as Chairman of the Arch Board of Directors ended, Mr. Iordanou initiated multiple communications with me, including phone conversations and at least one in person meeting in Raleigh, North Carolina, in which Mr. Iordanou and I discussed my plan for launching a residential mortgage REIT after the termination of my employment from Arch.   In those communications, Mr. Iordanou expressed interest in working with me in the new venture I planned to launch after my employment with Arch ended.

8

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2019.

Andrew Rippert

 **Arch**

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("**Agreement**"), dated as of _October 30_, 2017, between Arch Capital Group Ltd., a Bermuda corporation (the "**Company**"), and Andrew Rippert (the "**Executive**").

The parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01. _Definitions._ For purposes of this Agreement, the following terms have the meanings set forth below:

"**Accounting Firm**" has the meaning set forth in Section 12.10.

"**Affiliate**" means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with the Company. For purposes hereof, (a) "Control" means the ownership, directly or indirectly, of (i) in the case of a corporation, Voting Securities (as defined below) representing 50% or more of the total voting power or value of all the then outstanding Voting Securities of such corporation or (ii) in the case of a partnership, limited liability company, association or other business entity ("Business Entity"), 50% or more of the partnership or other similar ownership interest of such Business Entity; and (b) "Voting Security" means any security of a corporation which carries the right to vote generally in the election of directors. For purposes of the definition of "Control," (x) a Person will be deemed to have a 50% or more ownership interest in a Business Entity if such Person is allocated 50% or more of Business Entity gains or losses or controls the managing director or member or general partner of such Business Entity; and (y) "Controlling" and "Controlled" have meanings correlative thereto.

"**Base Salary**" has the meaning set forth in Section 4.01.

"**Bonus Amount**" means the greater of (i) the Executive's target annual bonus for the year during which Notice of Termination is given, or (ii) the average of the Executive's actual annual bonus for the three years immediately preceding the year during which Notice of Termination is given (or such lesser number of years in which the Executive was employed by the Company or its Affiliate).

"**Cause**" means (a) theft or embezzlement by the Executive with respect to the Company or its Affiliates; (b) malfeasance or gross negligence in the performance of the Executive's duties; (c) the Executive's conviction of any felony or any crime involving moral turpitude; (d)

willful or prolonged absence from work by the Executive (other than by reason of disability due to physical or mental illness) or failure, neglect or refusal by the Executive to perform his duties and responsibilities without the same being corrected within ten (10) days after being given written notice thereof; (e) continued and habitual use of alcohol by the Executive to an extent which materially impairs the Executive's performance of his duties; (f) the Executive's use of illegal drugs; or (h) the material breach by the Executive of any of the covenants contained in this Agreement.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Confidential Information" means information that is not generally known to the public and that was or is used, developed or obtained by the Company or its Affiliates in connection with their business. It shall not include information (a) required to be disclosed by court or administrative order or called for in a subpoena or discovery request regular on its face, (b) lawfully obtainable from other sources or which is in the public domain through no fault of the Executive; or (c) the disclosure of which is consented to in writing by the Company.

"Date of Termination" has the meaning set forth in Section 5.01.

"Employment Period" has the meaning set forth in Section 2.01.

"Good Reason" means, without the Executive's written consent and subject to the timely notice requirement and the Company's opportunity to cure set forth in Section 5.05 below, (a) the material diminution of any material duties or responsibilities of the Executive; (b) a material reduction in the Executive's Base Salary; or (c) any material breach by the Company of the provisions contained in this Agreement.

"Intellectual Property" has the meaning set forth in Section 7.01.

"Notice of Termination" has the meaning set forth in Section 5.05.

"Noncompetition Period" has the meaning set forth in Section 9.01.

"Nonsolicitation Period" has the meaning set forth in Section 9.02.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, an estate, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Permanent Disability" means those circumstances where the Executive is unable to continue to perform the usual customary duties of his assigned job or as otherwise assigned in accordance with the provisions of this Agreement for a period of six (6) months in any twelve (12) month period because of physical, mental or emotional incapacity resulting from injury,

sickness or disease. Any questions as to the existence of a Permanent Disability shall be determined by a qualified, independent physician selected by the Company and approved by the Executive (which approval shall not be unreasonably withheld). The determination of any such physician shall be final and conclusive for all purposes of this Agreement.

"**Reimbursable Expenses**" has the meaning set forth in Section 4.04.

"**Start Date**" has the meaning set forth in Section 2.01.

## ARTICLE 2

## EMPLOYMENT

SECTION 2.01. *Employment*. The Company shall employ the Executive, and the Executive shall accept employment with the Company, for the period beginning on the date hereof (the "Start Date") and ending on the Date of Termination as provided in Section 5.01 (the "Employment Period"). If the Executive fails to satisfy the condition set forth in the preceding sentence, he shall forfeit all rights hereunder.

## ARTICLE 3

## POSITION AND DUTIES

SECTION 3.01. *Position and Duties*. During the Employment Period, the Executive shall serve as Chief Executive Officer, Global Mortgage Group of the Company and shall have such responsibilities, powers and duties as may from time to time be prescribed by the President of the Company; provided that such responsibilities, powers and duties are substantially consistent with those customarily assigned to individuals serving in such positions at comparable companies or as may be reasonably required by the conduct of the business of the Company. During the Employment Period the Executive shall devote substantially all of his working time and efforts to the business and affairs of the Company. The Executive shall not directly or indirectly render any services of a business, commercial or professional nature to any other person or for-profit organization not related to the business of the Company or its Affiliates, whether for compensation or otherwise, without prior written consent of the Company.

SECTION 3.02. *Work Permits*. The Executive shall cooperate in all reasonable respects with the Company to obtain, maintain and renew a suitable (for the purposes of the Executive's contemplated employment by the Company) work permit by the Bermuda government authorities and any other permits required by any Bermuda government authority. The Company shall be responsible for permit fees, and all other expenses, including legal expenses, in connection with obtaining and maintaining such work permit.

SECTION 3.03. *Work Location.* While employed by the Company hereunder, the Executive shall perform his duties (when not traveling or engaged elsewhere in the performance of his duties) at the offices of the Company in Bermuda.  The Executive shall travel to such places on the business of the Company in such manner and on such occasions as the Company may from time to time reasonably require.

SECTION 3.04. *Relocation. U*pon the termination of Executive's employment for any reason, the Company shall reimburse the Executive for all reasonable expenses incurred by him for the cost of relocating all of his household items to the United States and airfare for Executive and his family to return to the United States, in each case, subject to the Company's requirements with respect to reporting and documentation of such expenses; provided, however, that any such expenses must be incurred by the Executive not later than the last day of the calendar year following the calendar year in which the Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company occurs, and any such reimbursement shall be made promptly upon presentation by the Executive to the Company of the required documentation and, in all events, no later than the last day of the second calendar year following the calendar year in which the Executive's "separation from service" with the Company occurs.

ARTICLE 4

BASE SALARY AND BENEFITS

SECTION 4.01. *Base Salary.* During the Employment Period, the Executive's base salary will be $650,000 per annum (the "**Base Salary**"). The Base Salary will be payable monthly on the 15th day of each month, two weeks in arrears and two weeks in advance. Annually during the Employment Period the Company shall review with the Executive his job performance and compensation, and if deemed appropriate by the Board of Directors of the Company, in its discretion, the Executive's Base Salary may be increased.  Normal hours of employment are 8:30 a.m. to 5:00 p.m., Monday to Friday.  The Executive's salary has been computed to reflect that his regular duties are likely, from time to time, to require more than the normal hours per week and the Executive shall not be entitled to receive any additional remuneration for work outside normal hours.

SECTION 4.02. *Bonuses.* In addition to the Base Salary, the Executive shall be eligible to participate in an annual bonus plan on terms set forth from time to time by the Board of Directors of the Company. The Executive's target annual bonus will be 100% of his Base Salary.

SECTION 4.03. *Benefits.* In addition to the Base Salary, and any bonuses payable to the Executive pursuant to this Agreement, the Executive shall be entitled to the following benefits during the Employment Period:

(a) such major medical, life insurance and disability insurance coverage as is, or may during the Employment Period, be provided generally for other senior

executive officers of the Company as set forth from time to time in the applicable plan documents;

(b) in addition to the usual public holidays and eight (8) paid days off for sick leave, a maximum of five (5) weeks of paid vacation annually during the term of the Employment Period (Section 11 of the Bermuda Employment Act 2000 shall otherwise not apply to the Executive's employment hereunder);

(c) benefits under any plan or arrangement available generally for the senior executive officers of the Company, subject to and consistent with the terms and conditions and overall administration of such plans as set forth from time to time in the applicable plan documents;

(d) payment by the Company of the reasonable cost of preparation of annual tax returns and associated tax planning on a basis no less favorable than such arrangements provided on the date hereof to similarly situated senior executives residing in Bermuda, and the cost paid by the Company under this Section 4.03(d) for one calendar year shall be paid by the Company promptly upon presentation by the Executive to the Company of the required documentation and, in all events, not later than the end of the following calendar year; and

(e) other fringe benefits customarily provided from time to time during the Employment Period to similarly situated senior executives residing in Bermuda.

SECTION 4.04. *Expenses.* The Company shall reimburse the Executive for all reasonable expenses incurred by him in the course of performing his duties under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses ("**Reimbursable Expenses**"), subject to the Company's requirements with respect to reporting and documentation of expenses.

SECTION 4.05. *Share-Based Awards.* The Executive shall be eligible to participate in the Company's Long Term Incentive and Share Award Plans (and any similar plan adopted by the Company) under which share-based awards may be granted, as determined by the Board of Directors of the Company in its discretion.


ARTICLE 5

TERM AND TERMINATION

SECTION 5.01. *Term.* The expected term of this Agreement is for at least three years from the Start Date. Notwithstanding the foregoing, the Employment Period shall in all events end on the Date of Termination, whenever occurring. For purposes of this Agreement, the

"Date of Termination" shall mean the first to occur of the following:  (a) the six (6) month anniversary of the Company providing Notice of Termination (as defined below) without Cause to the Executive; (b) immediately upon the Company providing Notice of Termination for Cause to the Executive; (c) the six (6) month anniversary of the Executive providing Notice of Termination specifying his resignation for Good Reason to the Company; (d) the six (6) month anniversary of the Executive providing Notice of Termination by the Executive without Good Reason to the Company; (e) the fifth (5th) day following the Company providing Notice of Termination to the Executive as a result of the Executive's Permanent Disability; and (f) the date of Executive's death.  In the event that there are circumstances which would give rise to a termination by the Company for Cause, the Company may, in its sole and exclusive discretion, treat such termination as a termination without Cause.  Upon termination of the Executive's employment with the Company for any reason, the Executive shall resign from all positions and in all capacities with the Company and its Affiliates or from any other company or other Person with which the Executive is serving at the Company's request.

SECTION 5.02 *Resignation by the Executive Without Good Reason.*  If the Employment Period shall be terminated as a result of the Executive's resignation or leaving of his employment, other than for Good Reason, the Executive shall continue to: (a) receive Base Salary and benefits set forth in Section 4.03 through the Date of Termination, except that any amount payable after the Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company will be subject to Section 12.09 below; and (b) the Company will make a cash lump sum payment to the Executive equal to one half of the sum of (I) the Bonus Amount, and (II) a pro-rated portion of the Bonus Amount based on the number of days elapsed in the calendar year through the date Notice of Termination is given, which payment shall be made on the date that is sixty (60) days following the Date of Termination, and (c) receive reimbursement of all Reimbursable Expenses incurred by the Executive prior to the Date of Termination.  The Executive's entitlements under all other benefit plans and programs of the Company shall be as determined thereunder.

SECTION 5.03 *Termination for Good Reason or Without Cause.*  If the Employment Period shall be terminated by the Executive for Good Reason or by the Company without Cause, the Executive shall continue to: (a) receive Base Salary through the six (6) month anniversary of the Date of Termination, such amount to be paid in accordance with the regular payroll practices of the Company (except that any amount otherwise payable after the Date of Termination and prior to the sixtieth (60th) day following the Date of Termination shall instead be paid on such sixtieth (60th) day), and except that any amount payable after the Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company will be subject to Section 12.09 below; (b) receive an amount equal to the sum of (i) the Executive's target annual bonus plus (ii) a pro-rated portion of the Executive's target annual bonus based on the number of days elapsed in the calendar year through the date Notice of Termination is given, one half of which amount shall be paid in cash in a single lump sum on the date that is sixty (60) days following the Date of Termination and the remaining half of which shall be paid in accordance with the regular payroll practices of the Company (except that any amount otherwise payable after the Date of Termination and prior to the sixtieth (60th) day

following the Date of Termination shall instead be paid on such sixtieth (60th) day); (c) receive benefits set forth in Section 4.03 above through the Date of Termination, except that any amount payable after the Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company will be subject to Section 12.09 below, and (d) receive his major medical insurance coverage benefits from the Company's plan in effect from time to time (provided the Executive continues to pay the portion of the premiums for such coverage that are charged to similarly situated active employees) for a period equal to the lesser of (i) six (6) months after the Date of Termination, and (ii) until the Executive is provided by another employer with benefits substantially comparable to the benefits provided by such plan; and (f) receive reimbursement for all Reimbursable Expenses incurred by the Executive prior to the Date of Termination. The Executive's entitlements under all other benefit plans and programs of the Company shall be as determined thereunder. Notwithstanding the foregoing, the Executive shall be entitled to the amounts described above (other than Base Salary and benefits as set forth in Section 4.03 through the Date of Termination) only if (i) the Executive has entered into an irrevocable (except to the extent required by law, and to the extent required by law to be revocable, has not revoked) general release of claims, which, subject to Section 5.07 below, is reasonably satisfactory to the Company ("Release"), on or before the date that is fifty (50) days following the Date of Termination (but not prior to the Date of Termination), and (ii) the Executive has not breached and does not breach the provisions of Sections 6.01, 7.01, 8.01, 9.01, 9.02 or 11.01 of this Agreement.

SECTION 5.04 *Termination for Other Reasons.* If the Employment Period shall be terminated by the Company with Cause, as a result of the Executive's Permanent Disability or upon the Executive's death, the Executive (or his beneficiaries or estate, in the case of death) shall continue to (a) receive Base Salary and benefits set forth in Section 4.03 above through the Date of Termination, except that any amount payable after the Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company will be subject to Section 12.09 below; and (b) in the case of termination due to the Executive's Permanent Disability or death, receive his major medical insurance coverage benefits from the Company's plan in effect at the time of such termination for a period equal to the lesser of (i) twelve (12) months after the Date of Termination, and (ii) until the Executive is provided by another employer with benefits substantially comparable to the benefits provided by such plan; and (d) receive reimbursement for all Reimbursable Expenses incurred by the Executive prior to the Date of Termination. The Executive's entitlements under all other benefit plans and programs of the Company shall be as determined thereunder.

SECTION 5.05. *Notice of Termination and Opportunity to Cure.* Any termination by the Company for Permanent Disability or Cause or without Cause or by the Executive for Good Reason or without Good Reason shall be communicated by written Notice of Termination to the other party hereto. For purposes of this Agreement, a **"Notice of Termination"** shall mean a notice which shall indicate the date the termination is to take effect (consistent with the terms of this Agreement), the specific termination provision in this Agreement relied upon and, for a termination for Permanent Disability or for Cause or for a resignation for Good Reason, shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of

employment under the provision indicated. It shall be a condition precedent to the Executive's right to terminate employment for Good Reason that (i) the Executive shall first have given the Company written notice that an event or condition constituting Good Reason has occurred within ninety (90) days after such occurrence, and any failure to give such written notice within such period will result in a waiver by the Executive of his right to terminate for Good Reason as a result of such event or condition, and (ii) a period of thirty (30) days from and after the giving of such written notice shall have elapsed without the Company having effectively cured or remedied such occurrence during such 30-day period, unless such occurrence cannot be cured or remedied within thirty (30) days, in which case the period for remedy or cure shall be extended for a reasonable time (not to exceed an additional fifteen (15) days) provided that the Company has made and continues to make a diligent effort to effect such remedy or cure.

SECTION 5.06. *Garden Leave.* Following any Notice of Termination, whether by the Company or the Executive and until the end of the Employment Period, the Company may direct, in its sole and exclusive discretion, that the Executive perform no duties and exercise no powers or authorities in connection with his employment, resign from any office with the Company and its Affiliates and not attend any premises of any of the Company and its Affiliates; provided, however, that, following any such direction, the Executive will continue to be required to comply with his other obligations under this Agreement and will continue to have a duty of loyalty to the Company as an employee ("Garden Leave"). Notwithstanding the above, the Company may at its discretion require the Executive to perform duties at any time during the Garden Leave, which duties may be withdrawn at any time at the Company's discretion, and, during the Garden Leave, the Executive shall: (a) remain an employee of the Company and be bound by the terms of this Agreement; (b) not, without the prior written consent of the Company, attend his place of work or any other premises of any of the Company and its Affiliates or access the information technology systems of the Company and its Affiliates; (c) not, without the prior written consent of the Company, contact or deal with (or attempt to contact or deal with) any officer, employee, consultant, client, customer, investor, supplier, agent, distributor, shareholder, adviser or other business contact of any of the Company and its Affiliates; (d) promptly disclose in writing to the Company any attempt at contact with the Executive made by any such person or entity with whom the Executive has been required to have no contact pursuant to this Section 5.06; and (e) be ready and available to perform such duties as the Company may require, ensuring that the Company knows where and how he can be contacted and complying with any written requests to contact a specified employee of the Company at specified intervals.

SECTION 5.07 *Release.* In consideration of the mutual promises herein and the payments detailed in this Article 5, the Executive, on behalf of himself and his heirs and assigns, in a form reasonably satisfactory to the Company, shall, with respect to any termination of employment under Section 5.03, execute a Release which irrevocably and unconditionally releases and forever discharges, individually and collectively, the Company and its Affiliates, and each of their respective officers, directors, employees, shareholders, representatives, parent companies, subsidiaries, predecessors, successors, assigns, attorneys and all persons acting by, through or in concert with them, of and from any and all charges, claims, complaints, demands, liabilities or causes of action, known or unknown, that the Executive may have at the

effective date of the Release or has ever had against any such Person. Notwithstanding any other provision hereof, the Executive shall not be required by any general release to release claims that the Executive may have against the Company that arise after the effective date of the Release, any rights the Executive may have to enforce Section 5.03 of this Agreement, or any rights of the Executive to be indemnified under the organizational documents of the Company and its Affiliates or under applicable law or pursuant to the Company's directors' and officers' liability insurance policies.

## ARTICLE 6

## CONFIDENTIAL INFORMATION

SECTION 6.01. *Nondisclosure and Nonuse of Confidential Information*. The Executive will not disclose or use at any time during or after the Employment Period any Confidential Information of which the Executive is or becomes aware, whether or not such Confidential Information is developed by him, except to the extent that such disclosure or use is directly related to and required by the Executive's performance of duties assigned to the Executive pursuant to this Agreement. Under all circumstances and at all times, the Executive will take all appropriate steps to safeguard Confidential Information in his possession and to protect it against disclosure, misuse, espionage, loss and theft.

SECTION 6.02. *Defend Trade Secrets Act*. Pursuant to 18 U.S.C. § 1833(b), the Executive understands that the Executive will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret of the Company that (i) is made (x) in confidence to a Federal, State, or local government official, either directly or indirectly, or to the Executive's attorney and (y) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. The Executive understands that if the Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Executive may disclose the trade secret to the Executive's attorney and use the trade secret information in the court proceeding if the Executive (I) files any document containing the trade secret under seal, and (II) does not disclose the trade secret, except pursuant to court order. Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section. Further, nothing in this Agreement or any other agreement or arrangement with the Company or any of its Affiliates shall prohibit or restrict the Executive from making any disclosure of information or documents to any governmental agency or legislative body, any self-regulatory organization, the Legal Department of the Company, and/or pursuant to the whistleblower provisions of the Dodd-Frank Act or Sarbanes-Oxley Act.

## ARTICLE 7

## INTELLECTUAL PROPERTY

SECTION 7.01. *Ownership of Intellectual Property.* In the event that the Executive as part of his activities on behalf of the Company generates, authors or contributes to any invention, design, new development, device, product, method of process (whether or not patentable or reduced to practice or comprising Confidential Information), any copyrightable work (whether or not comprising Confidential Information) or any other form of Confidential Information relating directly or indirectly to the business of the Company as now or hereinafter conducted (collectively, "**Intellectual Property**"), the Executive acknowledges that such Intellectual Property is the sole and exclusive property of the Company and hereby assigns all right title and interest in and to such Intellectual Property to the Company. Any copyrightable work prepared in whole or in part by the Executive during the Employment Period will be deemed "a work made for hire" under Section 201(b) of the United States Copyright Act of 1976, as amended, and the Company will own all of the rights comprised in the copyright therein. The Executive will promptly and fully disclose all Intellectual Property and will cooperate with the Company to protect the Company's interests in and rights to such Intellectual Property (including providing reasonable assistance in securing patent protection and copyright registrations and executing all documents as reasonably requested by the Company, whether such requests occur prior to or after termination of Executive's employment hereunder).

## ARTICLE 8

### DELIVERY OF MATERIALS UPON TERMINATION OF EMPLOYMENT

SECTION 8.01. *Delivery of Materials upon Termination of Employment.* As requested by the Company, from time to time and upon the termination of the Executive's employment with the Company for any reason, the Executive will promptly deliver to the Company all property of the Company in the Executive's possession or within his control, including, without limitation, all copies and embodiments, in whatever form or medium, of all Confidential Information or Intellectual Property in the Executive's possession or within his control (including written records, notes, photographs, manuals, notebooks, documentation, program listings, flow charts, magnetic media, disks, diskettes, tapes and all other materials containing any Confidential Information or Intellectual Property), irrespective of the location or form of such property and, if requested by the Company, will provide the Company with written confirmation that all such property have been delivered to the Company.

## ARTICLE 9

### NONCOMPETITION AND NONSOLICITATION

SECTION 9.01. *Noncompetition.* The Executive acknowledges that during his employment with the Company, he will become familiar with trade secrets and other Confidential Information concerning the Company and its Affiliates and their respective predecessors, and that his services will be of special, unique and extraordinary value to the Company.  In addition, the Executive hereby agrees that at any time during the Employment

Period, and for a period ending one (1) year after the termination of the Executive's employment (the "**Noncompetition Period**"), he will not directly or indirectly own, manage, control, participate in, consult with, render services for or in any manner engage in any Restricted Business;

provided, however, that if the Executive's termination of employment occurs as a result of the Executive's resignation or leaving of his employment other than for Good Reason, except as provided in clause (Y) below, the Noncompetition Period shall continue beyond the Date of Termination only if (i) the Company pays the Executive, for each day during which the Noncompetition Period so continues (taking into account Section 9.04 below), an amount equal to 1/365th of the sum of (A) the Executive's annual Base Salary, plus (B) the Executive's Bonus Amount, and (C) a pro-rated portion of the Executive's Bonus Amount based on the number of days elapsed in the calendar year through the date Notice of Termination is given, such amount to be paid in accordance with the regular payroll practices of the Company (except that any amount otherwise payable after the Date of Termination and prior to the sixtieth (60th) day following the Date of Termination shall instead be paid on such sixtieth (60th) day); and (ii) the Executive shall continue to receive his major medical insurance coverage benefits from the Company's plan in effect from time to time (provided the Executive continues to pay the portion of the premiums for such coverage that are charged to similarly situated active employees) for a period equal to the lesser of (x) the end of the Noncompetition Period, and (y) until the Executive is provided by another employer with benefits substantially comparable (with no pre-existing condition limitations) to the benefits provided by such plan; and provided further, however, that:

(X) the Company may elect, in its sole discretion, by written notice to the Executive given not more than ten (10) business days after the date Notice of Termination is given by the Executive without Good Reason, to not continue the Noncompetition Period beyond the Date of Termination or to reduce the Noncompetition Period under such circumstances so that it ends on the date set forth in such written notice (which shall not be later than twelve (12) months after the Date of Termination), in which case the Company's obligation to make payments and provide benefits under this Section 9.01 shall end at the end of the Noncompetition Period, and

(Y) the Company's requirement to make payments under this Section 9.01 as a condition to continuation of the Noncompetition Period shall apply only if the Executive has entered into a general release of claims reasonably satisfactory to the Company on or before the date that is fifty (50) days following the Date of Termination (but not prior to the Date of Termination) and does not revoke such release prior to the end of any applicable revocation period (it being understood that such general release will not require the Executive to release his rights under this Section 9.01 and will not contain any employment restrictions or non-solicitation obligations other than those set forth in this Agreement) and the Executive has not breached and does not breach the provisions of Sections 6.01, 7.01, 8.01, 9.01, 9.02 or 10.01 hereof.

"Restricted Business" means (i) any business competing with the mortgage insurance businesses of the Company or its Affiliates as such businesses exist or are in process as of the date of termination, within any geographical area in which the Company or its Affiliates engage or plan to engage in such businesses, and (ii) any business that is materially competitive with the businesses that (I) are at the time in question being conducted by the Company or its Affiliates with which the Executive was involved to a material extent in the twelve (12) months prior to termination of the Executive's employment, or (II) were, during the Executive's employment, either being conducted by, or being actively developed by, the Company or its Affiliates with which the Executive was involved to a material extent in the twelve (12) months prior to termination of Executive's employment. It shall not be considered a violation of this Section 9.01 for the Executive to be a passive owner of not more than 2% of the outstanding stock of any class of a corporation which is publicly traded, so long as the Executive has no active participation in the business of such corporation.

SECTION 9.02. *Nonsolicitation.* The Executive acknowledges that during his employment with the Company, he will become familiar with trade secrets and other Confidential Information concerning the Company, its Affiliates and their respective predecessors, and that his services will be of special, unique and extraordinary value to the Company.  The Executive hereby agrees that (a) during the Employment Period and for a period of one (1) year after the date of termination of employment (the "**Nonsolicitation Period**") the Executive will not, directly or indirectly, induce or attempt to induce any Relevant Employee of the Company or its Affiliates to leave the employ of the Company or its Affiliates, or in any way interfere with the relationship between the Company or its Affiliates and any Relevant Employee thereof or otherwise employ or receive the services of any individual who was a Relevant Employee of the Company or its Affiliates at the Date of Termination or within the twelve-month period prior thereto, and (b) during the Nonsolicitation Period, the Executive will not induce or attempt to induce any Restricted Customer to cease doing business with the Company or its Affiliates.  For purposes of this Agreement, a "Relevant Employee" shall mean a director, officer, underwriter or manager of the Company or its Affiliates, in each case with whom the Executive had material dealings at any time during the period of twelve (12) months prior to the Date of Termination. A "Restricted Customer" shall mean any firm, company or Person who was a customer, investor, supplier, client, insured, reinsured, reinsurer, broker, agent, licensee or other business relation of the Company or its Affiliates and with whom Executive had material dealings during

the twelve (12) months prior to termination of the Executive's employment.

SECTION 9.03. *Enforcement.* If, at the enforcement of Sections 9.01 or 9.02, a court holds that the duration or scope stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration and scope reasonable under such circumstances will be substituted for the stated duration or scope and that the court will be permitted to revise the restrictions contained in this Article 9 to cover the maximum duration and scope permitted by law.

SECTION 9.04 *Coordination with Garden Leave.* The lengths of the Noncompetition Period and the Nonsolicitation Period shall be reduced by any period that the Executive is required to remain away from the office during his notice period or not undertake his normal duties pursuant to Section 5.06 above.

ARTICLE 10

EQUITABLE RELIEF

SECTION 10.01. *Injunctive or Other Equitable Relief.* The Executive acknowledges that (a) the covenants contained herein are reasonable, (b) the Executive's services are unique, and (c) a breach or threatened breach by him of any of his covenants and agreements with the Company and its Affiliates contained in Sections 6.01, 7.01, 8.01, 9.01 or 9.02 could cause irreparable harm to the Company or its Affiliates for which they would have no adequate remedy at law. Accordingly, and in addition to any remedies which the Company and its Affiliates may have at law, in the event of an actual or threatened breach by the Executive of his covenants and agreements contained in Sections 6.01, 7.01, 8.01, 9.01 or 9.02, the Company and its Affiliates shall have the absolute right, without the need to post a bond or any other type of security, to commence a lawsuit or other proceeding in any court of competent jurisdiction (the "Selected Court") seeking injunctive or other equitable relief (an "Injunction Proceeding"). In furtherance thereof, the Executive expressly and irrevocably agrees that the Selected Court may exercise personal jurisdiction over him in connection with any Injunction Proceeding and further agrees not to assert that any court other than the Selected Court is a more suitable forum for an Injunction Proceeding.

ARTICLE 11

EXECUTIVE REPRESENTATIONS

SECTION 11.01. *Executive Representations.* The Executive hereby represents and warrants to the Company that (a) the execution, delivery and performance of this Agreement by the Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which he is bound, (b) the Executive is not a party to or bound by any employment agreement, noncompetition agreement or confidentiality agreement with any other Person

that affects his right or ability to perform the duties contemplated by this Agreement, , and (c) upon the execution and delivery of this Agreement by the Company, this Agreement will be the valid and binding obligation of the Executive, enforceable in accordance with its terms.

SECTION 11.02. *Company Representations*. The Company hereby represents and warrants to the Executive that (a) all acts required to be taken to authorize, deliver and perform this Agreement and the obligations of the Company provided for hereunder have been duly taken; and (b) upon the execution and delivery of this Agreement by the Company, this Agreement will be valid and binding obligation of the Company, enforceable in accordance with its terms.

## ARTICLE 12

## MISCELLANEOUS

SECTION 12.01. *Remedies*. The Company will have all rights and remedies set forth in this Agreement, all rights and remedies which the Company has been granted at any time under any other agreement or contract and all of the rights which the Company has under any law. The Company will be entitled to enforce such rights specifically, without posting a bond or other security, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. There are currently no disciplinary or grievance procedures in place, there is no collective agreement in place, and there is no probationary period.

SECTION 12.02. *Consent to Amendments*. The provisions of this Agreement may be amended or waived only by a written agreement executed and delivered by the Company and the Executive. No other course of dealing between the parties to this Agreement or any delay in exercising any rights hereunder will operate as a waiver of any rights of any such parties.

SECTION 12.03. *Successors and Assigns*. All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto will bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not, provided that the Executive may not assign his rights or delegate his obligations under this Agreement without the written consent of the Company.

SECTION 12.04. *Severability*. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

SECTION 12.05. *Counterparts*. This Agreement may be executed simultaneously in two counterparts, any one of which need not contain the signatures of more than one party, but all of which counterparts taken together will constitute one and the same agreement.

SECTION 12.06. *Descriptive Headings*. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

SECTION 12.07. *Notices*. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and shall be delivered personally by hand, by electronic transmission (with a copy following by hand or by overnight courier), by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service (charges prepaid). Communications delivered personally by hand shall be deemed received on the date when delivered personally to the recipient; communications sent by electronic means shall be deemed received one (1) business day after the sending thereof; communications sent by registered or certified mail shall be deemed received four (4) business days after the sending thereof; and communications delivered by overnight courier shall be deemed received one (1) business day after the date when sent to the recipient. Such notices, demands and other communications will be sent to the Executive and to the Company at the addresses set forth below.

| If to the Executive: | To the last address delivered to the Company by the Executive in the manner set forth herein. |
|---|---|
| If to the Company: | Arch Capital Group Ltd. |
| | Waterloo House |
| | 100 Pitts Bay Road |
| | Hamilton HM 12, Bermuda |
| | Attention: Secretary |
| | Tel: (441) 278-9250 |
| | Fax: 441-278-9255 |

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

SECTION 12.08. *Withholding*. The Company may withhold from any amounts payable under this Agreement such federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

SECTION 12.09. *409A and 457A*. This Section 12.09 shall apply to the Executive only if, and to the extent, he is subject to Section 409A or Section 457A of the Code. It is intended that this Agreement will comply with Sections 409A and 457A of the Code (and any regulations and guidelines issued thereunder), to the extent the Agreement is subject thereto, and the Agreement shall be interpreted on a basis consistent with such intent. If an amendment of the Agreement is necessary in order for it to comply with Section 409A or Section 457A, the parties hereto will negotiate in good faith to amend the Agreement in a manner that preserves the original intent of the parties to the extent reasonably possible. No action or failure to act, pursuant to this Section 12.09 shall subject the Company to any claim, liability, or expense, and

the Company shall not have any obligation to indemnify or otherwise protect the Executive from the obligation to pay any taxes, interest or penalties pursuant to Section 409A or Section 457A of the Code.

Notwithstanding any provision to the contrary in this Agreement, if the Executive is deemed on the date of his "separation from service" (within the meaning of Treasury Regulation Section 1.409A-1(h)) to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then with regard to any payment that is required to be delayed pursuant to Section 409A(a)(2)(B) of the Code (after taking into account the applicable provisions of Treasury Regulation Section 1.409A-1(b)(9)(iii)), the portion, if any, of such payment so required to be delayed shall not be made prior to the earlier of (i) the expiration of the six (6)-month period measured from the date of his "separation from service" or (ii) the date of his death (the "**Delay Period**").  Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Executive in a lump sum, and any remaining payments due under this Agreement shall be paid in accordance with the normal payment dates specified for them herein.  Whenever payments under this Agreement are to be made in installments, each such installment shall be deemed to be a separate payment for purposes of Section 409A of the Code.  Notwithstanding any provision of this Agreement to the contrary, for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment that are considered deferred compensation under Section 409A, references to the Executive's "termination of employment" (and corollary terms) with the Company shall be construed to refer to the Executive's "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) with the Company.  In no case will compliance with this Section by the Company constitute a breach of the Company's obligations under this Agreement.

With respect to any reimbursement or in-kind benefit arrangements of the Company and its subsidiaries provided for herein that constitute deferred compensation for purposes of Section 409A, except as otherwise permitted by Section 409A, the following conditions shall be applicable: (i) the amount eligible for reimbursement, or in-kind benefits provided, under any such arrangement in one calendar year may not affect the amount eligible for reimbursement, or in-kind benefits to be provided, under such arrangement in any other calendar year (except that the health and dental plans may impose a limit on the amount that may be reimbursed or paid), (ii) any reimbursement must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred, and (iii) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

SECTION 12.10. *Section 4999 of the Code.*  Anything in this Agreement or the Company's Incentive Compensation Plan to the contrary notwithstanding, in the event it shall be determined that any payment, award, benefit or distribution (including, without limitation, the acceleration of any payment, award, distribution or benefit), by the Company or any of its affiliates to or for the benefit of the Executive (whether pursuant to the terms of this

Agreement or otherwise) (a "**Payment**") would be subject to the excise tax imposed by Section 4999 of the Code or any corresponding provisions of state or local tax law (the "**Excise Tax**"), then such Payments shall either (a) be delivered in full, or (b) subject to, and in a manner consistent with the requirements of Section 409A of the Code, be reduced to the minimum extent necessary to ensure that no portion thereof will be subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state or local income and employment taxes and the Excise Tax, results in receipt by the Executive, on an after-tax basis, of the greatest amount of payments and benefits, notwithstanding that all or some portion of such payments and benefits may be subject to the Excise Tax.  In the event that any Payments are to be reduced pursuant to this Section 12.10, then the reduction shall be applied as follows: (i) first, on a pro rata basis to the Executive's cash severance payments under Section 5.03 above, and (ii) second, on a pro rata basis to Executive's equity incentive awards.  All determinations required to be made under this Article 12 shall be made by a nationally recognized  accounting or consulting firm (other than the regular outside accounting firm retained by the Company) selected by the Company and agreed to by the Executive, which agreement shall not be unreasonably withheld (the "**Accounting Firm**"), which Accounting Firm shall provide detailed supporting calculations both to the Company and the Executive within 15 business days after the receipt of notice from the Company that the Executive has received a Payment, or such earlier time as is requested by the Company.  Any determination by the Accounting Firm meeting the requirements of this Section 12.10 shall be binding upon the Company and the Executive.  The fees and disbursements of the Accounting Firm shall be paid by the Company.  If required, the Company shall enter into an engagement letter with the Accounting Firm containing reasonable and customary terms and provisions.

SECTION 12.11. *No Third Party Beneficiary*. This Agreement will not confer any rights or remedies upon any person other than the Company, the Executive and their respective heirs, executors, successors and assigns.

SECTION 12.12. *Entire Agreement*. This Agreement (including the documents referred to herein) constitutes the entire agreement among the parties and supersedes any prior understandings, agreements or representations by or among the parties, written or oral, that may have related in any way to the subject matter hereof, including, without limitation, the Employment Agreement, dated July 1, 2012, between Arch Reinsurance Ltd. and the Executive, which was transferred to the Company on November 1, 2013.  This Agreement shall serve as a written statement of employment for purposes of Section 6 of the Bermuda Employment Act 2000.

SECTION 12.13. *Construction*. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party. Any reference to any federal, state, local or foreign statute or law will be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The use of the word "including" in this Agreement means including without limitation and is intended by the parties to be by way of example rather than limitation.

SECTION 12.14. *Survival.* Sections 3.04, 5.03, 5.04, 6.01, 6.02, 7.01, 8.01 and Articles 9, 10, 11 and 12 will survive and continue in full force in accordance with their terms notwithstanding any termination of the Employment Period.

SECTION 12.15. *GOVERNING LAW.* ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY AND INTERPRETATION OF THIS AGREEMENT WILL BE GOVERNED BY THE LAW OF BERMUDA, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS, SAVE THAT WHERE PROVISIONS OF FOREIGN LAW APPLY IN THIS AGREEMENT, THEY WILL BE INTERPRETED AND CONSTRUED IN ACCORDANCE WITH SUCH FOREIGN LAW.

SECTION 12.16. *Arbitration.* Save for where the Company chooses to exercise its rights as described in Section 10.01, in the event that a dispute or difference shall arise between the parties out of, in connection with, or concerning this Agreement, such dispute shall be referred to and determined by a sole arbitrator in a confidential private arbitration in accordance with the UNCITRAL rules as same are incorporated into the Bermuda International Conciliation and Arbitration Act 1986, except as they may be modified herein or by mutual agreement of the parties. Any such arbitration proceeding shall take place before a single arbitrator. The arbitrator shall be acceptable to both the Company and the Executive. However, if the parties cannot agree on an acceptable arbitrator, then the arbitrator is to be appointed by the Appointments' Committee of the Chartered Institute of Arbitrators Bermuda Branch. The seat of arbitration shall be Bermuda and it shall be conducted in the English language. The parties shall bear their respective costs (including attorney's fees) and shall split the fee of the arbitrators (50% paid by the Company and 50% by the Executive). Judgment upon the final award rendered by such arbitrator may be entered in any court having jurisdiction thereof. Each party agrees that it shall maintain confidentiality in respect to any arbitration between them (including any decision rendered in such arbitration) except as necessary in connection with an enforcement proceeding or as required by law.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ARCH CAPITAL GROUP LTD.

By: _____

Name: Marc Grandisson

Title: President and Chief Operating Officer

_____

Andrew Rippert