Case 1:19-mc-03029-LDH   Document 1-3   Filed 11/26/19   Page 1 of 20 PageID #: 36

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ NOV 26 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE APPLICATION OF ANDREW RIPPERT ) MISC 19-3029
TO OBTAIN DISCOVERY FOR USE IN A ) Civil No. 19 Misc. ___
PROCEEDING IN A FOREIGN TRIBUNAL )
PURSUANT TO 28 U.S.C. § 1782(a) ) DeARCY HALL, J.
)

# MEMORANDUM OF LAW IN SUPPORT OF
# APPLICATION TO OBTAIN DISCOVERY FOR USE IN A
# PROCEEDING IN A FOREIGN TRIBUNAL PURSUANT TO 28 U.S.C. § 1782(a)

## PRELIMINARY STATEMENT

Applicant Andrew Rippert and his former employer, Arch Capital Group, Ltd. ("Arch"), are parties to an arbitration arising from Arch's wrongful termination of Mr. Rippert's employment, purportedly for "cause." The arbitration, which by agreement of the parties is subject to the Arbitration Rules of the United Nations Commission International Trade Law ("UNCITRAL"), is pending in Bermuda (the "Bermuda Arbitration").

Pursuant to 28 U.S.C. § 1782(a), Mr. Rippert is applying for an Order from this Court authorizing him to obtain discovery from Constantine Iordanou, who resides within the Eastern District of New York, for use in the Bermuda Arbitration. Mr. Iordanou, who was Chairman of the Arch Board of Directors when Arch terminated Mr. Rippert's employment in July 2019, has knowledge of and, on information and belief, documents concerning the false justification that Arch advanced for termination of Mr. Rippert's employment. As explained more fully below, Mr. Rippert's application satisfies the "statutory" requirements of § 1782(a) set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), because (a) Mr. Iordanou resides in this District, (b) the discovery Mr. Rippert is requesting is for use in a foreign proceeding in a foreign tribunal, namely the Bermuda Arbitration, and (c) Mr. Rippert is a party to the Bermuda

Arbitration and therefore an "interested person." In addition, consideration of the "discretionary" factors set forth in *Intel* demonstrates that the Court should exercise its discretion to grant Mr. Rippert's Application and permit him to obtain discovery from Mr. Iordanou.

## FACTUAL BACKGROUND

*Arch Capital Group, Ltd. is a specialty insurer and reinsurer.*

As described on its website, www.archcapgroup.com, Arch is a Bermuda public limited liability company that "writes insurance, reinsurance and mortgage insurance on a worldwide basis." According to Arch's website: "Arch Capital's current operations began in 2001 when our reinsurance operations were launched to meet a need for capacity. Through thoughtful organic growth and strategic acquisitions, Arch has evolved into a leading diversified specialty insurer and reinsurer. We have expanded into insurance and mortgage insurance with operations around the globe." According to a "Consolidated Corporate Overview" available on Arch's website, as of June 30, 2019, Arch had approximately $12.49 billion in capital and $31.40 billion in total assets.

*Mr. Rippert oversaw Arch's transformation from a new entrant in the U.S. mortgage insurance market in 2014 to the industry leader.*

Mr. Rippert commenced employment with Arch in 2010. From September 2010 until January 2014, he was Executive Vice President of Arch Reinsurance Ltd. In January 2014, Arch appointed Mr. Rippert Chief Executive Officer ("CEO") of Arch's Global Mortgage Group. Arch did not request that Mr. Rippert sign an employment agreement in connection with his promotion to CEO of the Global Mortgage Group. Declaration of Andrew Rippert ("Rippert Decl."), ¶ 4.

During his tenure as CEO of the Global Mortgage Group at Arch, Mr. Rippert was in charge of a network of operations that provided mortgage insurance and reinsurance around the

world. As CEO of the Global Mortgage Group, Mr. Rippert was responsible for leading and managing global mortgage credit risk operations for Arch, including mortgage insurance, reinsurance and credit risk transfer transactions in, among other areas, the United States, Europe, Australia, and Asia. *Id.,* ¶ 5.

Mr. Rippert oversaw Arch's transformation from a new entrant in the U.S. mortgage insurance market in 2014 to the industry leader, primarily through the 2017 acquisition of mortgage insurer United Guaranty Corporation from American International Group, Inc. Mr. Rippert's leadership was also instrumental in the development of reinsurance execution for GSE credit risk transfer transactions under Freddie Mac's Agency Credit Insurance Structure transactions and the development of innovative programs at Freddie Mac and Fannie Mae. *Id.,* ¶ 6.

Mr. Rippert's success as CEO of the Global Mortgage Group was substantial and well-documented. Underwriting income at Arch increased from $20,579,000 in 2013, the year before Mr. Rippert was appointed CEO of the Global Mortgage Group, to $856,593,000 in 2018. In addition, Mr. Rippert gained recognition as a leader in the mortgage industry, was appointed to the boards of the Mortgage Bankers Association and the Housing Policy Council, and testified before the United States Congress on issues relating to the housing finance industry. *Id.,* ¶ 7.

### *Almost four years after Mr. Rippert's promotion to CEO of the Global Mortgage Group, Arch required that he sign an employment agreement for the position.*

In or about October 2017, Arch presented Mr. Rippert with a written employment agreement governing the position as CEO of the Global Mortgage Group, to which Arch first appointed him in January 2014. Mr. Rippert did not have a prior employment agreement with Arch relating to the position. On about October 30, 2017, Arch and Mr. Rippert executed the written employment agreement (the "Employment Agreement"). *Id.,* ¶¶ 8-9. A copy of the

Employment Agreement is attached as Exhibit 1 to the Rippert Declaration.

The Employment Agreement sets forth, among other terms, Mr. Rippert's duties as CEO of Arch's Global Mortgage Group. In addition, the Employment Agreement contains noncompetition (§ 9.01) and nonsolicitation (§ 9.02) covenants, as well as a garden leave provision (§ 5.06). The Employment Agreement also contains an arbitration clause (§ 12.16). Arch provided no consideration for any of these provisions. *Id.*, ¶ 10.

The arbitration clause provides *inter alia*:

> Save for where the Company chooses to exercise its rights as described in Section 10.01, in the event that a dispute or difference shall arise between the parties out of, in connection with, or concerning this Agreement, such dispute shall be referred to and determined by a sole arbitrator in a confidential private arbitration in accordance with the UNCITRAL rules as same are incorporated into the Bermuda International Conciliation and Arbitration Act 1986, except as they may be modified herein or by mutual agreement of the parties. . . . The seat of arbitration shall be Bermuda and it shall be conducted in the English language.

Employment Agreement, ¶ 12.16.

On information and belief, Marc Grandisson, then the President and Chief Operating Officer of Arch, required that Mr. Rippert execute the Employment Agreement because he planned to terminate Mr. Rippert's employment at Arch and to harm Mr. Rippert's career after his employment at Arch ended. On information and belief, no officers in the Global Mortgage Group other than Mr. Rippert were required to sign written employment agreements. Rippert Decl., ¶ 12.

### *Arch removed Mr. Rippert as CEO of the Global Mortgage Group in February 2019 and terminated his employment in July 2019.*

Notwithstanding Mr. Rippert's demonstrably successful tenure as CEO of Arch's Global Mortgage Group and his stellar reputation in the housing finance industry, as well as the support of Arch directors, in February 2019, Mr. Grandisson removed Mr. Rippert as CEO of the Global

Mortgage Group. On information and belief, Mr. Grandisson made the decision to remove Mr. Rippert as CEO of the Global Mortgage Group because he viewed Mr. Rippert as a successful rival who was beginning to eclipse Mr. Grandisson's own accomplishments, particularly as Mr. Rippert was gaining increased notoriety in the mortgage industry though his appearances before Congress and involvement in leading industry groups such as the Mortgage Banking Association. *Id.*, ¶ 13.

On February 6, 2019, Mr. Rippert met with Mr. Grandisson and Carl Sullo, Chief Human Resources Officer at Arch, who notified him that Arch was removing him from the position of CEO of the Global Mortgage Group. Asserting without basis that Mr. Rippert was "difficult to work with," Mr. Grandisson stated, "We need to find something else for you to do." Mr. Rippert denied the assertion and informed Mr. Grandisson that the decision to remove him as CEO of the Arch Global Mortgage Group was yet another of Mr. Grandisson's multiple attempts in recent years to undermine Mr. Rippert's credibility and to attack him personally and professionally. *Id.*, ¶ 14.

For at least two weeks, Arch did not inform Mr. Rippert what his new position would be or what the duties of the new position would be. On February 26, 2019, Arch presented Mr. Rippert with a draft communication from Mr. Grandisson to Arch employees concerning Mr. Rippert's new position at Arch. The draft communication stated in part:

> I'm pleased to announce that Andrew Rippert has been named Arch's first Chief Innovation and Strategic Investment Officer, reporting to me.
>
> In this role, Andrew will focus his attention on some of the critical issues facing the Mortgage Group in the housing finance industry, work to ensure a standardized approach to government relations across our operating units and engage with leaders across all of our business lines to pursue new ideas and opportunities. The goal is for us to prepare for the next several decades and insure that we are approaching our business as the disruptors, instead of the disrupted.

*Id.*, ¶ 15.

On March 1, 2019, Arch publicly announced Mr. Rippert's removal as CEO of the Global Mortgage Group and his appointment as Chief Innovation and Strategic Investment Officer. Also on March 1, 2019, Mr. Rippert emailed a "term sheet" to Mr. Grandisson and Mr. Sullo setting forth proposed terms of an agreement to govern Arch's engagement of Mr. Rippert as Chief Innovation and Strategic Investment Officer. Mr. Grandisson did not respond to Mr. Rippert's term sheet. *Id.*, ¶ 16.

Mr. Rippert had serious concerns that Mr. Grandisson had no intention of assigning any significant duties to him in his new position, but instead intended to isolate Mr. Rippert and effectively deprive him of the opportunity to make use of his expertise, experience and reputation in the housing finance industry, and to damage Mr. Rippert's career in that industry. Those concerns proved to be well founded. *Id.*, ¶ 17.

On Sunday, March 17, 2019, Mr. Rippert met with Mr. Grandisson in Bermuda. The purpose of the meeting was to discuss Mr. Rippert's proposed terms of an agreement to govern his new position at Arch. Mr. Grandisson told Mr. Rippert that in his new position at Arch, Mr. Rippert will not run any businesses that he innovates or develops for Arch. Rather, the new businesses will be taken from him and given to someone else. Mr. Grandisson told Mr. Rippert that he should not care what becomes of the business innovations he develops because Arch is going to pay him and that is all that matters. Mr. Grandisson stated at the meeting that he will not provide Mr. Rippert with any staff to fulfill his responsibilities in his new position at Arch. Mr. Rippert informed Mr. Grandisson that the past twenty-five (25) years of his career had been entirely within the housing finance industry and he could not simply walk away from that career. Mr. Grandisson responded: "Well, that is what you will do if you are to remain employed by

Arch." Even though the stated purpose of the March 17 meeting was to discuss Mr. Rippert's term sheet setting forth proposed terms for an employment agreement governing Arch's employment of Mr. Rippert as Chief Innovation and Strategic Investment Officer, Mr. Grandisson did not even respond to Mr. Rippert's term sheet. In fact, Mr. Grandisson specifically stated that he would not provide Mr. Rippert any feedback on Mr. Rippert's term sheet until Mr. Rippert assured him he was willing to stay at Arch. Mr. Grandisson told Mr. Rippert to take two weeks and think about what he wants to do, and if Mr. Rippert agreed to stay at Arch, Mr. Grandisson would respond to the term sheet. Alternatively, Mr. Grandisson stated, Mr. Rippert could work for the next six months and figure out what he wanted to do. *Id.*, ¶ 18.

On April 15, 2019, through counsel, Mr. Rippert gave Arch written notice that Arch's removal of him as CEO of Global Mortgage Group and his subsequent appointment as Chief Innovation and Strategic Investment Officer constituted "Good Reason" for termination of his employment at Arch as the term is defined in the Employment Agreement.[1] The April 15, 2019 letter also set forth Mr. Rippert's business plans following the termination of his employment at Arch:

> Mr. Rippert does not intend to compete with Arch. Mr. Rippert intends to establish what can best be described as a residential mortgage REIT. The company's business activities will include the buying, selling and managing of mortgage loans, mortgage backed securities and related mortgage instruments, including mortgage servicing rights for the expanded credit market. The company will seek funding by raising equity capital, 'warehouse lines of credit,' issuance of mortgage backed securities, establishing specific targeted investor funds for the purpose of owning mortgage loan portfolios. Arch has no comparable business and Mr. Rippert's proposed business would not threaten the misappropriation of Arch's confidential information or goodwill. Accordingly, Mr. Rippert's

---

[1] The Employment Agreement defines "Good Reason" as follows: "'Good Reason' means, without the Executive's written consent and subject to the timely notice requirement and the Company's opportunity to cure set forth in Section 5.05 below, (a) the material diminution of any material duties or responsibilities of the Executive; (b) a material reduction in the Executive's Base Salary; or (c) any material breach by the Company of the provisions contained in this Agreement." Employment Agreement, § 1.01.

> proposed business will not constitute a 'Restricted Business' as that term is defined in the Employment Agreement or 'Competitive Activity' as that term is defined in Mr. Rippert's various incentive award agreements with Arch.

Rippert Decl., ¶ 19.

One week later, Arch directed that Mr. Rippert begin a Garden Leave for six (6) months and that he "perform no duties" during that period. During the Garden Leave, Mr. Rippert complied with his obligations to Arch in all respects. While Mr. Rippert made preparations during the Garden Leave to launch the residential mortgage REIT described in the April 15, 2019 letter after his employment with Arch terminated, he did not, in fact, operate or conduct the planned business during the Garden Leave. *Id.*, ¶ 20.

Nonetheless, on July 19, 2019, Arch terminated Mr. Rippert's employment, purportedly "for Cause," as that term is defined in the Employment Agreement, asserting that Mr. Rippert breached the noncompetition and nonsolicitation provisions of the Employment Agreement.[2] In fact, Arch had no Cause to terminate Mr. Rippert's employment. Mr. Rippert did not breach the noncompetition provision of the Employment Agreement because while he made plans to operate a business after termination of his Arch employment, he did not operate any business during the Garden Leave and the business he made plans to operate did not compete with any business operated by Arch. Moreover, while employed by Arch, Mr. Rippert did not solicit directly or indirectly, induce or attempt to induce any current or former officer, director, underwriter or manager of Arch with whom Mr. Rippert had material dealings at any time during

---

[2] The Employment Agreement defines "Cause" as follows: "'Cause' means (a) theft or embezzlement by the Executive with respect to the Company or its Affiliates; (b) malfeasance or gross negligence in the performance of the Executive's duties; (c) the Executive's conviction of any felony or any crime involving moral turpitude; (d) willful or prolonged absence from work by the Executive (other than by reason of disability due to physical or mental illness) or failure, neglect or refusal by the Executive to perform his duties and responsibilities without the same being corrected within ten (10) days after being given written notice thereof; (e) continued and habitual use of alcohol by the Executive to an extent which materially impairs the Executive's performance of his duties; (f) the Executive's use of illegal drugs; or (h) the material breach by the Executive of any of the covenants contained in this Agreement." Employment Agreement, § 1.01.

the twelve months prior to the date Arch terminated his employment to leave Arch or in any way interfere with Arch's employment of that officer, director, underwriter or manager. While employed by Arch, Mr. Rippert did not induce or attempt to induce any firm, company or person who was a customer, investor, supplier, insured, reinsured, reinsurer, broker, agent, licensee or other business relation of Arch, and with whom Mr. Rippert had material dealings during the twelve months before Arch terminated his employment, to cease doing business with Arch. While employed by Arch, Mr. Rippert did not use or disclose any Arch confidential information or trade secrets, except where such use or disclosure was directly related to and was required by Mr. Rippert's performance of the duties assigned to him pursuant to the Employment Agreement. Moreover, the noncompetition and nonsolicitation provisions of the Employment Agreement were and are unenforceable because Arch provided Mr. Rippert with no consideration in exchange for his execution of the Employment Agreement, as required under the law of Bermuda. Thus, by terminating Mr. Rippert for Cause when it was aware that there was no Cause, Arch breached the duty of trust and confidence it owed to Mr. Rippert and terms of the Employment Agreement. *Id.*, ¶ 21.

***The Bermuda Arbitration***

On the same day that it terminated Mr. Rippert's employment, namely July 19, 2019, Arch also initiated the Bermuda Arbitration by serving its "Statement of Claim." On August 21, 2019, Mr. Rippert served his "Statement of Defence/Answer and Counterclaims." Arch served an "Answer and Defenses" to Mr. Rippert's Counterclaims on September 19, 2019. The issues in dispute in the Bermuda Arbitration relate to Arch's wrongful termination of Mr. Rippert. In September and October 2019, the parties explored the possibility of mediation. However, the parties never mediated their disputes and now have restarted the Bermuda Arbitration. *Id.*, ¶¶

22-24.

*Constantine Iordanou*

Constantine Iordanou resides in the Eastern District of New York. Mr. Iordanou served as Chairman of the Arch Board of Directors from January 2002 until September 2019. Mr. Iordanou was Chairman of the Arch Board of Directors when Arch removed Mr. Rippert from the position of CEO of the Global Mortgage Group and when Arch terminated Mr. Rippert's employment at Arch. In addition, Mr. Iordanou was Chairman of the Arch Board of Directors when Arch initiated the Bermuda Arbitration and Mr. Rippert served his Statement of Defence/Answer and Counterclaims in the Bermuda Arbitration. On information and belief, Mr. Iordanou attended Arch board meetings at which the subject of Mr. Rippert's removal as CEO of the Global Mortgage Group and termination from Arch, as well as the Bermuda Arbitration, were discussed. *Id.*, ¶ 25.

Between March 29, 2019 and May 19, 2019, in the months before Mr. Iordanou's term as Chairman of the Arch Board of Directors ended, Mr. Iordanou initiated multiple communications with Mr. Rippert, including phone conversations and at least one in person meeting in Raleigh, North Carolina, in which Mr. Iordanou and Mr. Rippert discussed Mr. Rippert's plan for launching a residential mortgage REIT after the termination of his employment from Arch. In those communications, Mr. Iordanou expressed interest in working with Mr. Rippert in his new venture. *Id.*, ¶ 26.

Accordingly, Mr. Iordanou possesses information and, on information and belief, documents relevant to the Bermuda Arbitration, including information and documents concerning Arch's businesses and business plans, Arch's termination of Mr. Rippert's employment, the residential mortgage REIT about which Mr. Rippert made plans during the

period of his Garden Leave, and whether such a business will compete with any business being conducted by Arch. These are the subjects of the discovery that Mr. Rippert is seeking to obtain from Mr. Iordanou. The categories of documents that Mr. Rippert proposes to obtain from Mr. Iordanou are set forth in Schedule A to the proposed subpoena *duces tecum* to Mr. Iordanou, attached to Mr. Rippert's Application as <u>Exhibit 1</u> (the "Subpoena *Duces Tecum*"). The topics about which Mr. Rippert proposes to depose Mr. are the following:

1. Arch's Statement of Claim in the Bermuda Arbitration.
2. Arch's plans and progress developing businesses described in the Arch Statement of Claim.
3. Mr. Rippert's Statement of Defence/Answer and Counterclaims in the Bermuda Arbitration.
4. Arch's removal of Mr. Rippert as Chief Executive Officer of the Arch Global Mortgage Group in or about February 2019.
5. Arch's termination of Mr. Rippert's employment on or about July 19, 2019.
6. All matters discussed between Mr. Iordanou and Mr. Rippert relating to Mr. Rippert's plans to establish a residential mortgage REIT after termination of his employment at Arch.
7. The competitiveness or lack of competitiveness between Mr. Rippert's proposed residential mortgage REIT and any business conducted by Arch.

## **LEGAL ARGUMENT**

As demonstrated in Section B below, because Mr. Rippert's application satisfies the statutory requirements of 28 U.S.C. § 1782(a), the Court is authorized to permit Mr. Rippert to obtain discovery from Mr. Iordanou for use in the Bermuda Arbitration. Moreover, for the

reasons set forth in Section C below, consideration of the "discretionary" factors identified by the Supreme Court in *Intel* favors the Court's exercise of its discretion to permit Mr. Rippert to obtain discovery from Mr. Iordanou.

**A.     The Law Governing Applications Under 28 U.S.C. § 1782(a).**

Section 1782(a) of Title 28 of the United States Code provides *inter alia*:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

"In ruling on an application made pursuant to section 1782, a district court must first consider the statutory requirements and then use its discretion in balancing a number of factors." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012). There are three "statutory" requirements. "[A] district court is authorized to grant a § 1782 request where: (1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Id.* (citations omitted).

"'Once the statutory requirements are met, a district court is free to grant discovery in its discretion.'" *Id.* (quoting *Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004)). The Supreme Court has identified four additional "discretionary" factors that "bear consideration" in ruling on a request under § 1782(a):

(1) whether 'the person from whom discovery is sought is a participant in the

>foreign proceeding,' in which case 'the need for § 1782(a) aid generally is not as apparent'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'

*Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (quoting *Intel,* at 264-265). The district court's discretion under § 1782 "must be exercised in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 297-98 (citation and internal quotation marks omitted).

As demonstrated below, Mr. Rippert's application satisfies the statutory requirements of § 1782(a) and consideration of the discretionary factors identified in *Intel* favors the Court's exercise of its discretion to authorize Mr. Rippert to obtain the requested discovery from Mr. Iordanou.

**B.     Mr. Rippert's Application Satisfies the Statutory Requirements of 28 U.S.C. § 1782(a).**

Mr. Rippert's § 1782(a) Application easily satisfies the first and third statutory requirements of 28 U.S.C. § 1782(a) because Mr. Iordanou resides in the Eastern District of New York and Mr. Rippert is a party to the Bermuda Arbitration and, therefore, an "interested person." *In re Chevron Corp.*, No. M-19-11, 2010 U.S. Dist. LEXIS 47034, *17 (S.D.N.Y. May 10, 2010)(held that Chevron was an "interested party" under § 1782(a) because it was a party to the foreign litigation and the foreign arbitration in which it sought to use its requested discovery); *In re Mesa Power, LLC,* No. 2:11-mc-270-ES, 2013 U.S. Dist. LEXIS 67091, *15 (D. N. J. April. 19, 2013)(claimant in NAFTA arbitration is an "interested person" under § 1782(a)). *See also Intel*, 542 U.S. at 256 ("[n]o doubt litigants are included among, and may be

the most common example of, the 'interested person[s]' who may invoke § 1782").

Mr. Rippert's application satisfies the second statutory requirement, as well, because the information requested in the proposed Subpoena *Duces Tecum* is for use in a proceeding in a "foreign or international tribunal," namely the Bermuda Arbitration. The issue whether an arbitration constitutes a "foreign or international tribunal" under § 1782(a) has been addressed repeatedly, though not consistently, in courts. Some courts have determined that a purely private arbitration is not a "tribunal" as that term is used in § 1782(a). *See, e.g. In re Application by Rhodianyl S.A.S.*, No. 11-1026-JTM, 2011 U.S. Dist. LEXIS 72918 (D. Kan. March 25, 2011). Other courts, including most recently the Sixth Circuit Court of Appeals, have held that the phrase "foreign or international tribunal" in § 1782(a) includes purely private arbitrations. *See Abdul Latif Jameel Transp. Co. v. FedEx Corp.*, 939 F.3d 710 (6th Cir. 2019)("the word 'tribunal' includes private commercial arbitral panels established pursuant to contract and having the authority to issue decisions that bind the parties"). The Court does not need to decide the broader question at issue in these cases, however, because in this case the Bermuda Arbitration is governed by the UNCITRAL rules. Multiple courts in multiple jurisdictions, including in this Circuit, have held that an arbitration proceeding conducted under the UNCITRAL rules is a "proceeding in a foreign or international tribunal" under § 1782(a). *See In Re Mesa Power Group, LLC*, 2013 U.S. Dist. LEXIS 767091, at *12-13 ("a majority of courts have found that an international arbitration proceeding conducted pursuant to UNCITRAL rules constitutes a 'foreign or international tribunal' for the purposes of the statute")(citations omitted); *Republic of Ecuador v. Bjorkman*, 801 F.Supp.2d 1121, 1124 (D. Col. 2011)("There appears to be significant agreement at the district court level that, after the Supreme Court's *dicta* in *Intel Corp.*, international arbitral bodies operating under UNCITRAL rules constitute 'foreign tribunals' for

purposes of Section 1782")(citations and internal quotation marks omitted); *In re Chevron Corp.*, 2010 U.S. Dist. LEXIS 47034, at *17-19 ("international arbitral bodies operating under UNCITRAL rules constitute 'foreign tribunals' for purposes of Section 1782"); *Chevron v. Shefftz*, 754 F.Supp.2d 254, 260 (D.Mass. 2010)("international arbitral bodies operating under UNCITRAL rules constitute 'foreign tribunals' for purposes of § 1782"); *In re Veiga*, 746 F.Supp.2d 8, 22-23 (D.D.C. 2010)("courts that have had the opportunity to address the issue [whether arbitrations conducted under UNCITRAL rules] have concluded that such arbitrations fall within the ambit of § 1782(a)"); *In re Chevron Corp.*, No. 3:10-cv-00686, 2010 U.S. Dist. LEXIS,*5 n. 3 (M.D. Tenn. Aug. 17, 2010)("§ 1782 does apply to an arbitration conducted under the auspices of UNCITRAL"); *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, No. 3:09 MC 265. 2009 U.S. Dist. LEXIS 109492, *6-14 (D.Conn. Aug. 27, 2009)(arbitration governed by foreign or international tribunal under § 1782(a). *See also Intel*, 542 U.S. at 259 ("legislative history of the 1964 revision of § 1782 . . . reflects Congress' recognition that judicial assistance would be available 'whether the foreign or international proceeding or investigation is of a criminal, civil, administrative, *or other nature*'")(quoting S. Rep. No. 1580, at 9)(emphasis added).[3]

*NBC v. Bear Stearns & Co.*, 165 F.3d 184 (2d Cir. 1999), decided before *Intel*, does not dictate a different result. There, the Second Circuit held that a "commercial arbitration conducted in Mexico under the auspices of the International Chamber of Commerce, a private organization, headquartered in France," is not a "proceeding in a foreign or international tribunal." Here, by contrast, the Bermuda Arbitration is not an arbitral tribunal conducted under the auspices of a private organization. *See In re Chevron Corp.*, 2010 U.S. Dist. LEXIS 47034, at *17-18

---

[3] *See also Intel*, 542 U.S. at 258 ("'[t]he term 'tribunal' . . . includes investigating magistrates, administrative and *arbitral tribunals*, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts'")(quoting Smit, International Litigation under the United States Code, 65 *Colum. L. Rev.* 1015, 1027 (1965))(emphasis added).

(distinguishing *NBC* and stating, "the arbitration here at issue is not pending in an arbitral tribunal established by private parties . . . [i]t is pending in a tribunal established by an international treaty, the B[ilateral] I[nvestment] T[reaty] between the United States and Ecuador, and pursuant to the UNCITRAL rules").

Moreover, the discovery Mr. Rippert is seeking to obtain from Mr. Iordanou plainly is for "use" in the Bermuda Arbitration. While Mr. Rippert is not required to show that the information sought would be discoverable or admissible in Bermuda Arbitration, the information sought is clearly relevant to the issues in the Bermuda Arbitration. *See Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application."). Mr. Rippert's Application plainly satisfies the requirement that the discovery requested is for use in a foreign or international tribunal.

Accordingly, the Court is authorized by § 1782(a) to permit Mr. Rippert to obtain the requested discovery from Mr. Iordanou.

## C.   The Discretionary Factors Weigh in Favor of Granting the Application.

Once the statutory requirements of Section 1782 are met, courts consider the four discretionary "Intel factors." *See Brandi-Dohrn*, 673 F.3d at 80-81. Each of these factors weighs in favor of granting Mr. Rippert's Application.

### 1. Whether the person from whom discovery is sought is a participant in the foreign proceeding

Mr. Iordanou is not a party to the Bermuda Arbitration[4] and does not reside in Bermuda. Thus, the first factor weighs in favor of granting Mr. Rippert's application. "[N]onparticipants in

---

[4] Notwithstanding Mr. Iordanou's former membership on the Arch Board of Directors, he is not a party to the Bermuda Arbitration. *See In Re Hallmark Capital Corp.*, 534 F.Supp.2d 981 (D. Minn. 2008)(granting § 1782(a) application to obtain discovery from chairman of the board of party to Israel arbitration).

the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 254. Here, evidence from Mr. Iordanou is unobtainable without § 1782(a) assistance. *See In re Application of Ecuador v. Douglas,* 153 F.Supp.3d 484, 488 (D.Mass. 2015) ("UNCITRAL Rules make no provision for requiring production of documents from non-parties, as opposed to parties")(citing UNCITRAL Arbitration Rules Art. 24.3 (1976)). Accordingly, the first factor favors granting Mr. Rippert's Application. *See also In re Chevron Group,* 2010 U.S. Dist. LEXIS 47034, at *20 (first discretionary factor favors granting application where individual from whom discovery was sought for use in Ecuadorian court and arbitral tribunal was located in New York and not a party to litigation or arbitration in which applicant sought to use requested discovery); *OJSC Ukrnafta v. Carpatsky Petroleum Corp.,* 2009 U.S. Dist. LEXIS 109492, at *14 (target of §1782(a) application "is not a participant, nor is it expected to be a participant, of the arbitration proceedings . . . so Section 1782 relief is necessary for [applicant] to obtain discovery from [target"); *In re Mesa Power Group, LLC,* 2013 U.S. Dist. LEXIS 57091, at *16 (first discretionary factor favors granting application where the target of the discovery requested was not a party to the arbitration); *Chevron Corp. v. Shefftz,* 754 F.Supp. 2d at 261 (first factor weighs in favor of granting discovery where individual from whom discovery was sought resided outside the jurisdiction of Ecuadorian court and UNCITRAL Arbitration panel).

### 2. The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance

The second discretionary factor also favors granting Mr. Rippert's Application because there is no reason to believe and no evidence that the Bermuda Arbitration tribunal would be unreceptive to evidence obtained through § 1782 discovery. The court in *In re Veiga* found the

- 17 -

second discretionary factor favored granting a § 1782 application because "[t]here is no indication, let alone authoritative proof, that the Ecuadoran courts or the BIT Arbitration panel would reject any of the documents or information gathered pursuant to the Applications. . . . [O]ther courts have found both the Ecuadorian judiciary and arbitral bodies operating under UNCITRAL rules to be generally receptive to federal court assistance under § 1782(a)." 746 F.Supp.2d at 24 (citations omitted). Similarly, in *In re Mesa Power Group, LLC,* 2013 U.S. Dist. LEXIS 67091, at *18, the court found the second factor favored the applicant on grounds equally applicable here: "There is no evidence before the Court to suggest that the NAFTA tribunal is hostile to U.S. federal-court assistance under § 1782(a). The tribunal is organized pursuant to NAFTA and the UNCITRAL Arbitration Rules and neither prohibits the filing or receipt of information under § 1782(a)." Accordingly, the second discretionary factor favors granting Mr. Rippert' Application.

### 3. Whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. Here, Mr. Rippert is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence. *See OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 2009 U.S. Dist. LEXIS 109492, at *14 (finding third factor favors granting § 1782(a) application where "there is nothing before the Court to suggest that [Applicant] is attempting to conceal an attempt to circumvent foreign proof-gathering restrictions"); *In re Veiga,* 746 F.Supp.2d at 25 (third factor favors petition where "[t]here is no evidence in the record -- none -- that would lead this Court to believe the Applicants have sought to circumvent the proof-gathering procedures or policies of the foreign tribunals or otherwise brought their

applications in bad faith"). Thus, the third *Intel* factors favors granting Mr. Rippert's Application.

### 4. Whether the request is 'unduly intrusive or burdensome'

Finally, because Mr. Rippert's requests are carefully circumscribed and targeted to elicit information concerning central issues in the Bermuda Arbitration, they are not "unduly intrusive or burdensome" to Mr. Iordanou. Accordingly, the fourth factor also favors permitting Mr. Rippert to obtain the requested discovery.

Thus, consideration of the four discretionary factors favors the Court's exercise of its discretion to permit Mr. Rippert to obtain the requested discovery from Mr. Iordanou.

### CONCLUSION

For the reasons set forth above, Applicant Rippert respectfully requests that the Court grant his Application pursuant to 28 U.S.C. § 1782(a) to obtain discovery from Mr. Iordanou and permit Mr. Rippert to cause to be served on Mr. Iordanou the Subpoena *Duces Tecum* attached as Exhibit 1 to the Application.

Dated: November 25, 2019

Respectfully submitted,
ANDREW RIPPERT

By his attorneys,
LAWSON & WEITZEN, LLP

_____
Joshua M. D. Segal (Bar No. JS1948)
JSegal@Lawson-Weitzen.com
LAWSON N& WEITZEN, LLP
88 Black Falcon Avenue. Ste. 345
Boston, MA 02210
Telephone (617) 439-4990
Facsimile (617) 439-3987

Address for purposes of N.Y. Jud. Law § 470
SEGAL & GREENBERG
179 Franklin Street
New York, New York 10013
*Please use Massachusetts address for all
purposes unless otherwise necessary